**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE**

In re

                                                      Case No. 12-30549

KEILLY DEWAYNE YARBOROUGH
LAURA BELINDA YARBOROUGH
fka LAURA BELINDA HUFFORD

                    Debtors


**MEMORANDUM ON MOTION OF
JOINT DEBTOR, LAURA YARBOROUGH, FOR CONVERSION
TO INDIVIDUAL CHAPTER 13 CASE**


**APPEARANCES:**    C. EDWIN SHOEMAKER, ESQ.
                              9111 Cross Park Drive
                              Suite D-200
                              Knoxville, Tennessee  37923
                              Attorney for Debtors

                              HODGES, DOUGHTY & CARSON, PLLC
                              Alicia Cottrell, Esq.
                              Post Office Box 869
                              Knoxville, Tennessee  37901
                              Attorneys for Tod Hufford


**RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE**

This contested matter is before the court upon the Motion of Joint Debtor, Laura Yarborough, for Conversion to Individual Chapter 13 Case (Motion to Convert) filed by the Debtor Laura Belinda Yarborough,[1] on June 1, 2012, seeking to convert her Chapter 7 case to a case under Chapter 13. On June 21, 2012, the Debtor's former spouse, Tod Hufford, filed the Objection to Motion of Joint Debtor, Laura Yarborough, for Conversion to Individual Chapter 13 Case (Objection to Motion to Convert). As stated in the scheduling Order entered on July 13, 2012, the issue before the court is whether the Motion to Convert should be denied on grounds of the Debtor Laura Belinda Yarborough's bad faith.

An evidentiary hearing on the Motion to Convert was held on September 17, 2012. The record before the court consists of Joint Stipulations of Fact as to Motion for, and Objection to, Conversion from Chapter 7 to an Individual Chapter 13 Case filed by the parties on September 11, 2012, five exhibits entered into evidence, and the testimony of Mr. Hufford and the Debtor. Additionally, the court has taken judicial notice of undisputed material facts of record in the Debtors' case file and in *Hufford v. Yarborough (In re Yarborough)*, Adv. No. 12-3052.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O) (2006).

I

The Debtors filed the Voluntary Petition commencing their joint Chapter 7 bankruptcy case on February 13, 2012. In Schedules I and J filed with their petition, the Debtors scheduled current

---

[1] All references in this Memorandum to "Debtor" shall refer solely to Laura Belinda Yarborough. Any references to "Debtors" shall refer to both Laura Belinda Yarborough and Keilly DeWayne Yarborough.

monthly income of $5,047.20, consisting of $1,860.00 from Mr. Yarborough's veterans' disability and $3,187.20 from Mrs. Yarborough's three part-time positions: as a radiographer with Fort Sanders Regional Medical Center (Fort Sanders) and University Health Systems (UT Hospital) and an instructor with Roane State Community College (Roane State), and monthly expenses of $5,047.20. COLL. TRIAL EX. 1.  Noted at the bottom of Schedule I was the statement "Wife's income reduced in recent months - seeking full-time employment." COLL. TRIAL EX. 1. The Debtors amended Schedules I and J on September 10, 2012, to reflect a combined income of $5,251.66 from Mrs. Yarborough's employment and Mr. Yarborough's veterans' disability benefits and expenses of $5,001.98. COLL. TRIAL EX. 6.

Additionally in their statements and schedules, the Debtors scheduled no secured debt, no unsecured priority debt, and unsecured nonpriority debt in the amount of $108,984.77. COLL. TRIAL EX. 1. Included within the scheduled unsecured nonpriority debt was a debt of the Debtor owing Tod Hufford in the amount of $36,340.00 labeled as "Disputed" for a "Civil Action/Judgment-asserted child support overpayment." COLL. TRIAL EX. 1. This debt stems from an Order entered by the Circuit Court for the Fifth Judicial Circuit, Vermilion County, Illinois, on October 9, 2009, granting Mr. Hufford a judgment in the amount of $36,340.00 (Judgment) and resolved child support arrearage, credit, and overpayment issues related to the parties' minor child after their divorce in March 1988. TRIAL EX. 2.[2] On May 21, 2012, Mr. Hufford initiated an adversary proceeding in the Debtor's bankruptcy case, *Hufford v. Yarborough (In re Yarborough)*, Adv. No. 12-3052, seeking a determination that the Judgment is nondischargeable pursuant to 11 U.S.C. § 523(a)(5) and/or (15)

---

[2] The Debtor testified that following entry of the Order, she made arrangements to pay Mr. Hufford $100.00 monthly but only made one such payment in April 2010. *See* TRIAL EX. 3.

3

(2006). The Debtor filed the Motion to Convert on June 1, 2012, expressly stating that the motion applied solely to her and did not affect the pending Chapter 7 as to Keilly DeWayne Yarborough, who subsequently received a discharge on July 25, 2012. Mr. Hufford filed his Objection to Motion to Convert on June 21, 2012, arguing that the Debtor had not proposed to convert to Chapter 13 in good faith.

## II

Under the Bankruptcy Code, a debtor may convert to Chapter 13 "at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title[,]" and as long as "the debtor may be a debtor under such chapter." 11 U.S.C. § 706(a), (d) (2006). The right to convert to Chapter 13, however, is not absolute, and conversion may be denied where "cause" would exist to convert or dismiss the debtor's Chapter 13 case under 11 U.S.C. § 1307(c),[3] including inability to propose a confirmable plan and bad faith. *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 373-74, 127 S. Ct. 1105, 1111, 166 L.Ed.2d 956 (2007); *see also Copper v. Copper (In re Copper)*, 314 B.R. 628, 635 (B.A.P. 6th Cir. 2004) (collecting cases and citing bad faith, abuse of process, fraud, and futility among the reasons for denying conversion), *aff'd, Copper v. Copper (In re Copper)*, 426 F.3d 810 (6th Cir. 2005).

> [T]he broad authority granted to bankruptcy judges to take any action that is necessary or appropriate "to prevent an abuse of process" described in § 105(a) of the Code, is surely adequate to authorize an immediate denial of a motion to convert filed under § 706 in lieu of a conversion order that merely postpones the allowance

---

[3] "Except as [otherwise] provided . . ., on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . [.]" 11 U.S.C. § 1307(c) (2006).

4

> of equivalent relief and may provide a debtor with an opportunity to take action prejudicial to creditors.

*Marrama*, 549 U.S. at 375, 127 S. Ct. at 1112 (footnote omitted). The following factors are relevant for evaluation of a motion to convert from Chapter 7 to Chapter 13 pursuant to § 706(a):

> (i) whether the debtor is seeking to convert to chapter 13 in good faith (including a review of facts such as the timing of the motion to convert; the debtor's motive in filing the motion; and whether the debtor has been forthcoming with the bankruptcy court and creditors);
>
> (ii) whether the debtor can propose a confirmable chapter 13 plan;
>
> (iii) the impact on the debtor of denying conversion weighed against the prejudice to creditors caused by allowing conversion;
>
> (iv) the effect of conversion on the efficient administration of the bankruptcy estate; and
>
> (v) whether conversion would further an abuse of the bankruptcy process.

*In re Tufano*, 2011 WL 1473384, at *4 (Bankr. M.D. Pa. Apr. 19, 2011) (quoting *In re Piccoli*, 2007 WL 2822001, at *7 (E.D. Pa. 2007); *see also In re Grant*, 385 B.R. 627, 632 (Bankr. E.D. La. 2008) (applying the same factors).

Because denying a debtor's request to convert from Chapter 7 to Chapter 13 "has the same 'harsh result' as dismissal of a chapter 13 case under § 1307(c); that is, the debtor is denied the opportunity to propose and perform a chapter 13 plan that would allow him [or her] to repay his [or her] prepetition debt over a specified period of time consistent with his [or her] available resources[,] . . . bankruptcy courts should apply the same good faith standard when evaluating a debtor's motion to convert to chapter 13 as is utilized when considering dismissal of a case under § 1307(c)." *Condon v. Smith (In re Condon)*, 358 B.R. 317, 325 (B.A.P. 6th Cir. 2007). Whether

5

a debtor has filed his or her case in bad faith requires an examination of the totality of the circumstances, *Laguna Assocs. L.P. v. Aetna Cas. & Surety Co. (In re Laguna Assocs. L.P.)*, 30 F.3d 734, 738 (6th Cir. 1994), based upon a debtor's past and present circumstances. *In re Glenn*, 288 B.R. 516, 519-20 (Bankr. E.D. Tenn. 2002); *see also Metro. Emps. Credit Union v. Okoreeh-Baah (In re Okoreeh-Baah)*, 836 F.2d 1030, 1033 (6th Cir. 1988) ("Good faith is an amorphous notion, largely defined by factual inquiry."). The party challenging a debtor's good faith bears the burden of proof with any ambiguities resolved in favor of the debtor. *In re Godwin*, 2007 WL 4191729, at *5 n.11, 2007 Bankr. LEXIS 3976, at *17 n.11 (Bankr. M.D.N.C. Nov. 21, 2007) ("The 'honest' debtor has an absolute right to convert. Putting the burden of proof on the objecting party requires that party to demonstrate the debtor's dishonesty and avoids putting the debtor in the untenable position of having to prove a negative, i.e., that she was not dishonest."); *see also Condon*, 358 B.R. at 326 ("[T]he burden of proving a lack of good faith in the context of § 706(a) is on the party opposing the conversion.").

Although the Supreme Court did not "articulate with precision what conduct qualifies as 'bad faith' sufficient to permit a bankruptcy judge to dismiss a Chapter 13 case or to deny conversion from Chapter 7[,]" *Marrama*, 549 U.S. at 375 n.11, 127 S. Ct. at 1111 n.11, courts within the Sixth Circuit have consistently held that bad faith constitutes cause for dismissal under § 1307(c) when "the debtor is seeking to abuse the bankruptcy process." *Alt v. United States (In re Alt)*, 305 F.3d 413, 419 (6th Cir. 2002). In making the good faith determination, courts generally focus on the following factors:

> (1) the debtor's income; (2) the debtor's living expenses; (3) the debtor's attorney fees; (4) the expected duration of the Chapter 13 plan; (5) the sincerity with which

6

> the debtor has petitioned for relief under Chapter 13; (6) the debtor's potential for future earning; (7) any special circumstances the debtor may be subject to, such as unusually high medical expenses; (8) the frequency with which the debtor has sought relief before in bankruptcy; (9) the circumstances under which the debt was incurred; (10) the amount of payment offered by debtor as indicative of the debtor's sincerity to repay the debt; (11) the burden which administration would place on the trustee; and (12) the statutorily-mandated policy that bankruptcy provisions be construed liberally in favor of the debtor.

*Soc'y Nat'l Bank v. Barrett (In re Barrett)*, 964 F.2d 588, 592 (6th Cir. 1992).[4] Other relevant factors include "the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt[,] and whether any inaccuracies are an attempt to mislead the court[.]" *In re Caldwell*, 851 F.2d 852, 859 (6th Cir. 1988) (quoting *In re Estus*, 695 F.2d 311, 316-17 (8th Cir. 1982)). Courts also look to the following:

> "the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors."

*Alt*, 305 F.3d at 419 (quoting *In re Love*, 957 F.2d 1350, 1357 (7th Cir. 1992)). Weighing these factors, which "may circumstantially reflect the debtor's motivation, and ultimately [her] 'good faith,' in seeking relief under chapter 13[,]" assists courts in determining whether "the debtor's purpose in filing for chapter 13 relief is consistent with the underlying purpose and spirit of chapter 13 – i.e., financial 'rehabilitation through repayment of debt' – [and if] the filing is likely in good faith." *Condon*, 358 B.R. at 326 (internal citations omitted).

---

[4] In *Alt*, the Sixth Circuit cited the foregoing factors, which had been among those to be considered when determining whether a Chapter 13 plan had been proposed in good faith and stated that, as in other circuits, "[w]here present, the factors set forth by this court in the plan confirmation context are properly considered" in the context of whether a petition was filed in good faith. *Alt*, 305 F.3d at 420.

7

Additionally, because a debtor may not convert unless he or she is eligible to be a debtor under Chapter 13 and performance under a confirmed plan is required, courts may also examine the factors that are typically associated in the context of plan confirmation when considering a conversion under § 706(a).  *See Condon*, 358 B.R. at 326.  Confirmation of Chapter 13 plans is governed by 11 U.S.C. § 1325 which provides, *inter alia*, that a plan shall be confirmed if it satisfies the following requirements:

> (1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title;
>
> . . .
>
> (3) the plan has been proposed in good faith and not by any means forbidden by law;
>
> (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;
>
> . . .
>
> (6) the debtor will be able to make all payments under the plan and to comply with the plan[.]

11 U.S.C. § 1325(a) (2006).[5]

In his Objection to Motion to Convert, Mr. Hufford argues that the Debtor has moved to convert her case in bad faith because she has done so solely to discharge the Judgment she owes to him.  The Debtor does not dispute that had Mr. Hufford not filed the adversary proceeding seeking a determination that the $36,340.00 Judgment is nondischargeable, she would not be converting her

---

[5] The good faith standards under § 1325(a)(3) and (a)(7) are almost identical to those involving good faith and dismissal under § 1307(c).  *In re Hall*, 346 B.R. 420, 426 (Bankr. W.D. Ky. 2006).

8

case. She argues, however, that she is afforded that option under the Bankruptcy Code, and it is not bad faith to take advantage of Chapter 13's more favorable discharge provisions. The fact that the Debtor is seeking to convert solely because Mr. Hufford filed his adversary proceeding and the debt she owes him has a greater likelihood of being discharged under Chapter 13 than Chapter 7 is certainly a factor in the determination of whether she is seeking to convert in good faith; however, that fact, in and of itself, is not an abuse of the bankruptcy process. Nevertheless, when considered together with other factors, the Debtor's admitted motivation for conversion weighs against her. Although the Debtor is correct that the Bankruptcy Code does provide debtors with conversion options, after examination of the facts, taking into account the totality of circumstances, and in accordance with the *Tufano* factors cited above, the court finds that the Debtor is not seeking to convert her case in good faith and to allow conversion would further an abuse of the bankruptcy process. Additionally, the court is not convinced that the Debtor can propose a confirmable Chapter 13 plan and, after weighing both sides, the prejudice to her creditors if conversion was allowed outweighs the impact on the Debtor of denying her Motion to Convert.[6]

The first factors to be examined are the Debtor's income and expenses, her potential for future earnings, and whether she can, based upon her income and expenses, propose a feasible and confirmable plan. At trial, the Debtor testified that she currently works as a radiographer for Fort Sanders and UT Hospital and teaches a class at Roane State. As reflected in the Debtor's Amended Schedule I filed on September 10, 2012, Mrs. Yarborough's net monthly income from UT Hospital

---

[6] The court will not address one factor – the effect of conversion on the efficient administration of the bankruptcy estate – because there was no proof offered that would allow for an informed determination.

9

amounts to $2,966.35[7] and estimates monthly income of $216.32 and $208.99 from Fort Sanders and Roane State, respectively, for a total average net monthly income of $3,391.66. COLL. TRIAL EX. 6. Her position with Fort Sanders is part-time; she works as she is needed with no guarantee of a specific number of hours, and her teaching position with Roane State is not guaranteed but is dependent upon whether a sufficient number of students enroll in the class she teaches during any given semester, while her position with UT Hospital is full-time, forty hours each week at a rate of $23.49 per hour, which translates to $3,898.26 monthly. These are the same employers for whom the Debtor worked when the case was filed in February 2012, although her position with UT Hospital was part-time in February 2012, in that she worked as she was needed in a position similar to the one she currently holds with Fort Sanders.[8]

The Debtor's income is supplemented by that of Mr. Yarborough, who receives monthly veterans' disability benefits in the amount of $1,860.00, for a total household income of $5,251.66, which is $204.46 more than the income listed in the Debtors' original Schedule I. *Compare* COLL. TRIAL EX. 6 *with* COLL. TRIAL EX. 1.[9] As for expenses, the Debtor's Amended Schedule J reflects total household expenses of $5,001.98, which is, despite a move to a more expensive rental home and the addition of a car payment, $45.22 less than the monthly expenses set forth in the Debtors'

---

[7] This figure is derived from the Debtor's gross wages of $3,898.26 less taxes of $667.61, contributions to a 403(b) account in the amount of $108.33, and $155.97 for insurance. COLL. TRIAL EX. 6.

[8] At trial, the Debtor testified that her position with UT Hospital became full-time in April 2012. The Debtor did not provide a break-down of her income in the original Schedule I, which shows her total gross income as $3,840.00 at that time, so it cannot be ascertained what percentage of her income was attributed to which employer.

[9] In addition to payroll taxes and social security deductions of $667.61, the Amended Schedule I lists payroll deductions of $155.97 for insurance and $108.33 for a 403(b). COLL. TRIAL EX. 6. The original Schedule I lists only payroll deductions of $652.80. COLL. TRIAL EX. 1.

original Schedule J. *Compare* COLL. TRIAL EX. 6 *with* COLL. TRIAL EX. 1. The additional income of $204.46 plus the $45.22 in lowered expenses yields a monthly net income of $249.68, the amount reflected in paragraph 20 on the Debtor's Amended Schedule J. COLL. TRIAL EX. 6.

At trial, the Debtor testified that she anticipated paying $200.00 monthly into a plan. Although she has not proposed a Chapter 13 plan, the information contained in her Amended Schedules I and J raises serious questions as to the feasibility of any plan she might propose. The Debtor testified that her part-time income from Fort Sanders and Roane State is not consistent. With respect to her employment with Fort Sanders, she works only as she is needed with no guarantee of a minimum number of hours in any given week, and those hours fluctuate from week to week and month to month. As for her position with Roane State, she receives a contract to teach in a given semester based on whether enough students sign up for the class. The Debtor testified that she taught a class last spring but did not teach in the summer and that she is under contract to teach a class this fall, but she has not been scheduled to teach in the spring or any other semester thereafter. The Debtor also testified that it is the income she receives from her two positions with Fort Sanders and Roane State that she will fund her plan. Given the uncertainty of the Debtor's part-time work and the speculative amount of income derived therefrom, there is no assurance that she will be able to earn the additional $200.00 per month that would be necessary to fund the plan she states she will propose, although when questioned, the Debtor testified that if her income fluctuated, she would get the money "somehow" by "cutting back in other ways."

This testimony, however, is not supported by her Amended Schedule J. Several of the Debtors' expenses have increased between February 2012, when the Debtors filed their Chapter 7

11

petition, and September 2012. At trial, the Debtor testified that the Debtors had recently been forced to move from her mother-in-law's home, causing their rent to increase from $900.00 to $1,500.00 per month.[10] The court can also presume that this move caused the increase in other living expenses reflected in the Amended Schedule J: the Debtors' utilities – electricity, water and sewer, telephone, and DirectTV – increased from $727.20 to $774.98 and their food budget increased from $1,000.00 to $1,100.00. *Compare* COLL. TRIAL EX. 6 *with* COLL. TRIAL EX. 1. Likewise, the Debtors have recently purchased a vehicle for Mr. Yarborough, adding a monthly payment of $462.00, and although they scheduled $500.00 in their original Schedule J for the "proposed" purchase of two cars, that figure, which is only $38.00 more than the actual payment now being paid by the Debtors, represents only one of the two anticipated car payments. Accordingly, when the Debtors purchase a second new vehicle for Mrs. Yarborough, which she testified would be necessary, they would then add an additional car payment to their already tight budget.

The expenses that decreased between February 2012 and September 2012 are also evidence of that tight budget. The Debtors decreased their medical expenses from $100.00 to $85.00, decreased their transportation costs from $600.00 to $525.00, deleted their $130.00 life insurance expense, decreased their auto insurance expenses from $250.00 to $140.00, and decreased their expenses for "hair care/gifts/pets/sports" from $200.00 to $125.00. *Compare* COLL. TRIAL EX. 6 *with* COLL. TRIAL EX. 1. Taking these figures together, the Debtors decreased their expenses $405.00 without any explanation for doing so, although had they not, clearly there would be no

---

[10] This testimony is contrary to the Debtors' original Schedule J, which reflects that they were paying rent in the amount of $1,250.00 in February 2012. *Compare* COLL. TRIAL EX. 6 *with* COLL. TRIAL EX. 1. Notwithstanding this discrepancy, there is no dispute that their rent has increased substantially since February 2012.

12

surplus income on their Amended Schedule J and, accordingly, no surplus funds with which the Debtor could argue her ability to fund a plan. It is postponing the inevitable to convert a case under such iffy circumstances only to see the case re-converted to Chapter 7 because the Debtor cannot satisfy the requirements for confirmation.

The next relevant factors to be considered are the nature of Mrs. Yarborough's debts, the circumstances under which the debts were incurred and how they arose, how the Debtor has treated her creditors, the amounts to be paid as indicative of her sincerity to repay her debts, whether any debts could be nondischargeable in her Chapter 7 case, the timing of and motivation behind her requested conversion, the number of times she has filed bankruptcy, and whether she has been forthcoming with her creditors and the court. Based upon these factors, in addition to the foregoing concerning her ability to propose, fund, and confirm a feasible plan, the court has determined that the Debtor is not seeking to convert her case in good faith.

First, the Debtor's testimony at trial concerning her motivation for seeking to convert was inconsistent. Initially, when questioned whether she was converting her case because of Mr. Hufford's adversary proceeding, the Debtor answered that she was not, that she was converting her case to repay "all the debt that I have." Nonetheless, when asked whether she would have filed the Motion to Convert had Mr. Hufford not filed the adversary proceeding, she again answered no, stating that she converted on the advice of her attorney, and they decided not to remain with the Debtors' initial decision to file a Chapter 7 and for her to proceed under Chapter 13. She also later testified that the sole reason she was seeking to convert was because of Mr. Hufford's adversary proceeding. While the court believes that the Debtor's latter motivation is true, it is the former

13

statement – that she is converting because of "all the debt that I have" – which gives rise to serious questions as to the Debtor's veracity and good faith.

This is the Debtor's second bankruptcy filing within the last four years. The first case, No. 08-06036, which was also filed jointly with Mr. Yarborough, was filed in the District of South Carolina in October 2008, under Chapter 13. At that time, the Debtors' monthly income was $4,085.49 compared to expenses of $3,587.00, which yielded monthly net income of $498.49. COLL. TRIAL EX. 4. In that case, the Debtors scheduled secured debts totaling $294,862.04, including a mortgage on the Debtors' residence, two auto loans, two motorcycle loans, and a loan for household goods, unsecured priority debts owed for income taxes and attorney's fees in the aggregate amount of $6,765.65, and unsecured nonpriority debts in the amount of $16,153.95. COLL. TRIAL EX. 4. During the pendency of the case, Mr. Yarborough was relocated to Tennessee by the military. The Debtor testified that she could not find a job, and they were not allowed to have their plan payments modified, so they never resumed plan payments after moving, and the case was ultimately dismissed in May 2010 for nonpayment. *See also* COLL. TRIAL EX. 1.

Between the filing of their South Carolina case in October 2008, and the filing of their present case in February 2012, the Debtors incurred over $92,830.82 in additional unsecured debt.[11] *Compare* COLL. TRIAL EX. 4 *with* COLL. TRIAL EX. 1. The $108,984.77 amount scheduled by the Debtors in February 2012, includes the debts totaling $16,153.95 previously included within their South Carolina Chapter 13 case, none of which received any distribution through that case, as well

---

[11] Schedule F reflects a total of $108,984.77; however, there are a number of claims listed with an "unknown" amount. COLL. TRIAL EX. 1.

14

as Mr. Hufford's Judgment[12] and a number of charged off and deficiency debts. COLL. TRIAL EX. 1. When questioned at trial as to why the Debtors filed for Chapter 7 rather than Chapter 13, the Debtor testified that they had known they had the option to file a Chapter 13 case in February 2012, but after discussing it with their attorney, they had relied on his advice and filed for Chapter 7.

Clearly, the Debtors were well within their right to file under either Chapter 7 or 13. According to their Chapter 7 Statement of Current Monthly Income and Means-Test Calculation (Form B22A), their annualized current monthly income was $68,400.00, which was less than the $68,409.00 applicable median family income for a family of five in the State of Tennessee, and therefore, the presumption that they should file for Chapter 13 did not arise, nor were they required to calculate deductions for that purpose. Nevertheless, the Debtors' previous decision to file a Chapter 13 case in South Carolina weighs against any disingenuous statement by the Debtor that she is converting her case now to repay "all the debt that I have." When the Debtors filed their South Carolina case, they had four dependents compared to three in February 2012. Additionally, their income was $961.71 less than the income they scheduled in February 2012. Also noteworthy is the fact that their unsecured debt, which is the same now, when the Debtor seeks to convert, as it was in February 2012, has risen by $92,830.82 since they filed their South Carolina case, although a portion of that debt appears to be what had been previously scheduled in their Chapter 13 case as secured debt. Finally, when asked if anything changed about her liabilities from a Chapter 7 to a

---

[12] Mr. Hufford was not listed as a creditor in the Debtors' South Carolina bankruptcy; however, the Judgment forming the basis of his debt was not incurred until October 2009, approximately a year after the Debtors filed the case. Accordingly, the Debtor's obligation to Mr. Hufford was post-petition and was, therefore, not a part of the Debtors' South Carolina bankruptcy case. Notwithstanding the allegations to the contrary made by Mr. Hufford's counsel during her examination of the Debtor, the Debtors were not required to amend their statements and schedules or their plan to provide for Mr. Hufford's post-petition debt, nor were they required to inform Mr. Hufford that they were in a Chapter 13 bankruptcy case.

15

Chapter 13, the Debtor acknowledged "not really," and later acknowledged that only Mr. Hufford's debt would potentially be changed.

It is undisputed that the Debtor's obligation to Mr. Hufford is a pre-petition debt in the present case and, although she disputes the amount as well as the characterization of the Order as a judgment, the Debtor does not dispute that $18,140.00 of the $36,340.00 Judgment owed to Mr. Hufford pursuant to the October 9, 2009 Order is for an overpayment of child support.[13] Nevertheless, even though she acknowledges owing the debt, she has made only one $100.00 payment, in April 2010, towards the debt. *See* TRIAL EX. 3. There is also no question that if Mr. Hufford is successful in his adversary proceeding, any portion of the $36,340.00 debt owed to him by the Debtor found to fall within the scope of § 523(a)(5) or (15) would be nondischargeable in the Chapter 7 case but would be discharged under Chapter 13 if found to be a debt within the scope of § 523(a)(15). Likewise, as previously discussed, the Debtor does not dispute that she filed the Motion to Convert only eleven days after Mr. Hufford filed the adversary proceeding, and she testified, when questioned by her own counsel and then again reiterated through redirect by Mr. Hufford's counsel, that her sole reason for seeking to convert is the potential to discharge Mr. Hufford's debt. This fact is further supported by the Debtor's Answer filed in the adversary proceeding, which states "[b]y way of affirmative defense, Defendant asserts that an obligation under 11 U.S.C. [§ 523] (a)(15) is dischargeable under 11 U.S.C. Section 1328(a)[[14]]." ANSWER at ¶ 12.

---

[13] The Debtor detailed the circumstances through which Mr. Hufford overpaid the child support, stressing that she did not initiate the process. For the purposes of this contested matter, however, how or why the obligation was incurred is immaterial.

[14]    (a) Subject to subsection (d), as soon as practicable after completion by the debtor of all payments under the plan . . . the court shall grant the debtor a discharge of all debts provided for by the plan . . .
(continued...)

16

Taking all of these facts and circumstances together, and even construing the bankruptcy provisions liberally in her favor, the court finds that the Debtor is seeking to convert to Chapter 13 in bad faith. The Motion to Convert will, accordingly, be denied.

An Order consistent with this Memorandum will be entered.

FILED: September 24, 2012

>BY THE COURT
>
> */s/ RICHARD STAIR, JR.*
>
> RICHARD STAIR, JR.
> UNITED STATES BANKRUPTCY JUDGE

---

[14](...continued)

> except any debt –
>
> . . .
>
> (2) of the kind specified . . . in paragraph (1)(B), (1)(C), (2), (3), (4), (5), (8), or (9) of section 523(a)[.]

11 U.S.C. § 1328(a)(2).